RENDERED: SEPTEMBER 18, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0445-DG

LEXINGTON-FAYETTE URBAN COUNTY
GOVERNMENT

APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.                                  NO. 2022-CA-0029
FAYETTE CIRCUIT COURT NO. 21-CI-01972

FRATERNAL ORDER OF POLICE,                                  APPELLEE
BLUEGRASS LODGE #4

**OPINION OF THE COURT BY JUSTICE CONLEY**

**<u>REVERSING</u>**

This case is before the Court upon discretionary review of the Court of
Appeals' holding that Lexington-Fayette Urban County Government's (LFUCG)
Ordinance No. 056-2021 might, but might not conflict with the provisions of
SB 4, passed by the General Assembly, and now reflected in KRS[1] 455.180,
KRE[2] 410A, and KRS 523.010(1)(c).[3] The trial court held the two laws were not
in conflict. Upon review, we conclude the ordinance does conflict with the
statute. As LFUCG conceded at oral argument, a Lexington Police Department
(LPD) officer seeking a "no-knock warrant" pursuant to the statute would
necessarily be in violation of the ordinance prohibiting members of the LPD

---

[1] Kentucky Revised Statutes.

[2] Kentucky Rules of Evidence.

[3] Several legal questions regarding collective bargaining were also presented by
this appeal. Our ruling renders these questions moot and we decline to address them.

from seeking no-knock warrants. This is a conflict. The statute prevails and the ordinance is null, void, and of no effect.

## I.      Facts and Procedural Posture

SB 4 was signed by Governor Beshear on April 9, 2021. It created or amended several different sections of the laws of the Commonwealth; most notably, KRS 455.180. That statute generally establishes that no-knock warrants may only be issued upon clear and convincing evidence that the person who occupies the residence is alleged to have committed a crime that would qualify him as a violent offender if convicted, or has previously committed some kind of violent crime. KRS 455.180(1)(a). There must also be clear and convincing evidence there is a danger to life or destruction of evidence. *Id.* at (1)(b). It requires such warrants to be approved by a superior officer of the police officer seeking the warrant and that the Commonwealth's Attorney or the County Attorney has been consulted. *Id.* at (2) and (3). Finally, it authorizes such warrants only to be executed between 6 a.m. and 10 p.m. unless there is clear and convincing evidence of exigent circumstances. *Id.* at (5). Not only does failure to abide by these requirements result in the inadmissibility of evidence found as a result of execution of an improper no-knock warrant, KRE 410A, but an officer who perjures himself in an application for a no-knock warrant is subject to criminal charges. KRS 523.020(1)(c).

On June 24, 2021, the Mayor of Lexington signed Ordinance No. 056-2021, which states in pertinent part: "No police officer of the Lexington-Fayette

2

Urban County Government Department of Police shall seek or execute no-knock warrant [sic] at any location within Lexington-Fayette County." The Fraternal Order of Police, Bluegrass Lodge #4 (FOP) challenged this ordinance in Fayette Circuit Court. First, the FOP argued the ordinance conflicted with statutory law. Also brought before the trial court were several questions regarding collective bargaining and the duty of LFUCG to collectively bargain with the FOP prior to adopting the ordinance.

The trial court held "there is no express or implied conflict between the No-Knock Ordinance and SB 4."

> The plain language of SB 4 does not expressly prohibit a ban on no-knock warrants. SB 4 merely provides that *if* a court is going to issue a no-knock warrant, it must first meet certain preconditions. In other words, there is nothing in SB 4 that requires the use of no-knock warrants in any circumstance. Accordingly, there is no express conflict.

On appeal, the Court of Appeals seemingly disagreed with the trial court's analysis, but its conclusion was bound up within the broader context of the collective bargaining issues. Accordingly, the Court of Appeals reversed the trial court without holding there is a conflict. Instead, it remanded for consideration of "further pleadings and proof[.]"

In its briefing before this Court, the FOP argues "[t]he No-Knock Ordinance stands in direct conflict with Senate Bill 4; it imposes a complete ban on no-knock warrants, regardless of the clear, statutory ratification of these important safety mechanisms." It further argues SB 4 constitutes a comprehensive scheme of legislation and, therefore, the ordinance is also

3

preempted by SB 4. LFUCG argues "there is no conflict between SB 4 and the Ordinance, either in form or in substance." It specifically alleges "compliance with both is not impossible" because SB 4 is directed to judges and the conditions necessary to be met before a judge may sign and issue a no-knock warrant, whilst the ordinance is only directed at LPD officers and prohibiting them from ever seeking a no-knock warrant. According to LFUCG, "complying with the Ordinance by not seeking a no-knock warrant in the first place ensures there can be no violation of the state statute." LFUCG's counsel at oral argument, however, conceded that an LPD officer who seeks a no-knock warrant pursuant to the statute would necessarily be in violation of the ordinance. Therefore, its argument is not so clear cut as its briefing portends.

## II.    Analysis

The question we resolve today is nothing more than an interpretation of statutory law and a local ordinance; both questions are reviewed *de novo*. *Normandy Farm, LLC v. Kenneth McPeek Racing Stable, Inc.*, 701 S.W.3d 129, 135 (Ky. 2024) ("Statutory construction also presents a *de novo* question of law."); *Louisville Historical League, Inc. v. Louisville/Jefferson Cnty. Metro Gov.*, 709 S.W.3d 213, 230 (Ky. 2025) ("The interpretation of ordinances presents a *de novo* question of law.").

A perusal of SB 4 demonstrates the General Assembly considered the issue of no-knock warrants seriously and in-depth. SB 4 erects significant guardrails around the issuance of no-knock warrants that Kentuckians may justly believe protects their right from unreasonable searches and seizures

4

pursuant to a no-knock warrant. The clear and convincing evidentiary standard is a significantly higher requirement than probable cause. SB 4 authorizes no-knock warrants only for specific crimes or potentially violent offenders—they cannot be issued for just any suspected criminal behavior. And the time restriction allows them for hours in the day when people are generally awake—a significant issue when there have been several notable incidents around the country in which no-knock warrants executed in the middle of the night led the resident, jolted from sleep, to grab a gun and defend himself from what he may have believed was an unlawful intrusion by private individuals, only to be killed by law enforcement officers.

It is also clear that in erecting these guardrails the General Assembly did not deem it wise or prudent to altogether prohibit no-knock warrants. The General Assembly, through this legislation, has made a policy decision that while no-knock warrants should be sparingly used and generally reserved for violent and dangerous persons, they should not be forbidden. There are appropriate circumstances where such warrants are necessary, and those circumstances are still subject to judicial approval under a clear and convincing standard.

LFUCG's ordinance prohibits members of the Lexington Police Department from *ever* seeking a no-knock warrant. LFUCG has argued that compliance with the ordinance necessarily results in compliance with the statute. Its concession at oral argument, however, that an LPD officer who seeks a no-knock warrant pursuant to the statute will be in violation of the

5

ordinance is not only telling but correct. The statute and ordinance conflict, pure and simple.

KRS 67A.070(2)(a) declares an ordinance conflicts with a statute "[w]hen the ordinance authorizes that which is expressly prohibited by a general statute[.]" Contrary to the assertion that under this statute LFUCG may pass legislation that prohibits what the General Assembly expressly authorizes, our constitution unambiguously declares, "[t]he General Assembly may provide by general law that cities may exercise any power and perform any function within their boundaries that is in furtherance of a public purpose of a city *and not in conflict with a constitutional provision or statute.*" Ky. Const. § 156b (emphasis added).

> When this section of the Constitution provided for the classification of cities for their organization and a definition of their powers by general law, that was not a grant to the General Assembly of authority so to do, but was a limitation upon what, without those limitations, would be the absolute power of the General Assembly to do what it pleased.

*Bd. of Trustees of Policemen's Pension Fund v. Schupp*, 3 S.W.2d 606, 609 (Ky. 1928) (interpreting previous Ky. Const. § 156). In other words, Section 156b is a limitation upon the General Assembly in that creating a municipality it cannot authorize said municipality to contravene either the constitution or statutes. "It is a fundamental principle that municipal ordinances are inferior in status and subordinate to the laws of the state." *Boyle v. Campbell*, 450 S.W.2d 265, 268 (Ky. 1970) (quoting 37 Am. Jur. *Municipal Corporations* § 165). Consequently, "[a] power vested by legislation in a city corporation to

make by-laws for its own government, and the regulation of its own police, can not be construed as imparting to it, the power to repeal the [statutory] laws in force, or to supersede their operation by any of its ordinances." *March v. Commonwealth*, 51 Ky. 25, 29 (1851).[4] "Nor can the presumption be indulged that the Legislature intended that an ordinance passed by the city, should be superior to, and take the place of, the general law of the State upon the same subject." *Id.* Under Section 156b, even if the General Assembly explicitly authorized a city to pass ordinances that prohibit what a statute allows or allow what a statute prohibits, it would be unconstitutional.

"KRS 67A.070(2)(a) is a type of direct preemption in that an ordinance may be expressly prohibited by a general statute or when there is a comprehensive scheme of legislation." *Lexington Fayette Cnty. Food & Beverage Ass'n v. Lexington-Fayette Urb. Cnty. Gov't*, 131 S.W.3d 745, 750 (Ky. 2004). *A type*, not *the* only type.[5] As is clear from *Food & Beverage Ass'n*, we still consider whether there is implicit preemption. *Id.* at 751. Borrowing from the interaction between federal and state law, "[i]mplied preemption occurs when the state law *actually conflicts* with federal law or where the federal law so

---

[4] Although *March* is particularly old, its enduring relevance for constitutional interpretation is demonstrated by the fact that its holding was adopted by the framers of the Constitution of 1891 in Ky. Const. § 168.

[5] Louisville/Jefferson County Metro Government has a similar "home rule" provision granting "authority to govern themselves to the full extent required by local government and not in conflict with the Constitution or laws of this state or by the United States." KRS 83.410(1); *see also* KRS 83.420. We have recognized cities of the first class have an "enhanced authority . . . distinct from other municipalities. Yet, the sovereignty of the state still rules supreme." *Ky. Rest. Ass'n v. Louisville/Jefferson Cnty. Metro Gov't*, 501 S.W.3d 425, 428 (Ky. 2016).

thoroughly occupies the legislative field that it may be reasonably inferred that Congress left no room for the state to supplement it." *Id.* (quoting *Niehoff v. Surgidev Corp.,* 950 S.W.2d 816, 820 (Ky. 1997)) (emphasis added).

While the parties have devoted much of their argument to whether SB 4 constitutes a comprehensive scheme of legislation, the more fundamental inquiry is actual conflict—"[t]he true test of the concurrent authority of the state and local government to regulate a particular area is the absence of conflict." *Food & Beverage* Ass'n, 131 S.W.3d at 750. The ordinance fails to satisfy "this rudimentary principle." *Ky. Rest. Ass'n v. Louisville/Jefferson Cnty. Metro Gov't,* 501 S.W.3d 425, 428 (Ky. 2016). True enough, "[t]he simple fact that the state has made certain regulations does not prohibit local government from establishing additional requirements so long as there is no conflict between them." *Food and Beverage Ass'n*, 131 S.W.3d at 750. Nonetheless, "[a]n ordinance . . . cannot forbid what a statute expressly permits." *Ky. Rest. Ass'n*, 501 S.W.3d at 428 (quoting *City of Harlan v. Scott,* 162 S.W.2d 8, 9 (Ky. 1942)). To put it even more plainly, an ordinance cannot make illegal what a statute makes legal, or vice-versa. *Id.* The home rule provision of KRS 67A.070(2)(a) can neither alter nor obviate this principle. *Id.* A brief survey of decades of case law demonstrates that the ordinance below conflicts with the statute and must be declared void.

In *City of Harlan,* Harlan had passed an ordinance prohibiting the operation of movie theatres after 6 p.m. on Sundays pursuant to its general police power. 162 S.W.2d at 8. The General Assembly had regulated the extent

8

of this police power, however, and passed a statute establishing "that the operation of a moving picture show should not be construed a work, labor, trade, business or calling within the meaning of the section." *Id.* at 9. The Court held the statute created "a plain legislative declaration of policy regarding the operation of picture shows on Sunday, declaring that they shall not be construed as work or labor within the meaning of the Sunday closing law." *Id.* Therefore, the ordinance conflicted with the statute.

> [A] municipal ordinance prohibiting Sunday operation of picture shows is invalid since all municipal authority comes from the Legislature and municipal ordinances must be in harmony with the general laws of the State. An ordinance may cover an authorized field of local laws not occupied by general laws *but cannot forbid what a statute expressly permits* and may not run counter to the public policy of the state as declared by the Legislature.

*Id.* (emphasis added).

In *Arnold v. Commonwealth at Instance of City of Somerset*, Somerset passed an ordinance prohibiting the sale of "any drink containing any malt of any percentage of alcohol." 218 S.W.2d 661, 661 (Ky. 1949). A statute, however, defined "alcoholic beverage" as any drink containing more than one percent of alcohol by volume. *Id.* at 662 (quoting KRS 242.010, repealed in 1998). The Court declared the law to be "that a municipality cannot lawfully forbid what the legislature has expressly licensed, authorized, permitted, or required." *Id.* at 662 (quoting 37 Am. Jur. *Municipal Corporations* § 165). Therefore, because the statute permitted the sale of alcoholic beverages that were one percent of alcohol by volume or less, the ordinance conflicted as it forbade the sale of any beverage with any percentage of alcohol.

9

This case is particularly relevant because of its similitude to the argument now before us. Following LFUCG's logic, Somerset's ordinance could easily be justified in that it did nothing more than erect additional "guardrails" around the subject of alcoholic beverages. What conflict is there if the General Assembly says one percent of alcohol by volume or less is fine, and Somerset says no percentage of alcohol is the standard? Does not compliance with ordinance result in compliance with the statute? If the merchants of Somerset never sell a beverage with any alcohol in it, they will manifestly never violate a statute which limits alcohol to one percent by volume or less. Yet there is no trace of that kind of reasoning in the decision. *Arnold* went to the heart of the matter and did not bother with "semantic exercises[.]" *Kentucky Rest. Ass'n,* 501 S.W.3d at 428 (quoting *Wholesale Laundry Bd. of Trade, Inc. v. City of New York,* 17 A.D.2d 327, 329 (N.Y. App. Div. 1962)). The ordinance banned what the statute allowed; it is a *prima facie* conflict which needs no train of scholastic reasoning to justify.

In *Louisville & N. R. Co. v. Commonwealth for Use & Benefit of City of Covington*, the railroad was found guilty of violating a city ordinance when one of its moving trains obstructed a public street within the city for nine minutes. 488 S.W.2d 329, 329 (Ky. 1972). A city ordinance prohibited trains from obstructing public streets for more than five minutes at any one time. *Id.* at 330. A statute, however, prohibited obstruction "by stopping and permitting trains, engines or cars to stand upon a public grade crossing or upon a drawbridge for more than five (5) minutes at any one time[.]" *Id.* (quoting KRS

10

277.200(1)). The railroad argued the statute's explicit limitation to stopped and standing trains implicitly allowed for a moving train to obstruct a public street without time limit, therefore the ordinance was invalid as conflicting. The Court held otherwise, stating KRS 277.200(2) contemplated the existence of municipal ordinances therefore there was no preemption. *Id.* at 330-31.

For our purposes, however, we can say the statute and ordinance did not conflict. The statute only regulated stopped trains, not moving trains. The ordinance insofar as it also regulated stopped trains was consonant with the statute as both had a limitation of five minutes. But insofar as the ordinance pertained to moving trains, the statute simply did not apply; thus, no conflict. That method of analysis would be employed decades later by this Court in *Food and Beverage Ass'n,* 131 S.W.3d at 750.

In that case, the Food and Beverage Association of Lexington had argued LFUCG's smoking ban in public places conflicted with several statutes. *Id.* We held "those statutes deal almost exclusively with prohibiting the sale, distribution and use of tobacco products to or by persons under the age of 18." *Id.* We also held the Kentucky Food, Drug and Cosmetic Act and Retail Food Code were intended "to govern the food preparation and delivery in the state. Smoking is only considered insofar as the use of tobacco might affect food preparation and delivery." *Id.* at 751. Thus, "[t]here are no state statutes or regulations that expressly relate to indoor smoking and there is no declaration that indoor smoking is within the purview of the retail food code." *Id.* Because the statutes only regulated smoking insofar as food preparation was concerned

11

or regulated "the sale and distribution of tobacco to persons under the age of 18[,]" there was no statutory law regarding "the use of the tobacco products [in public places.]" *Id.* Therefore, an ordinance which only regulated the use of tobacco in public places presented "no conflict." *Id.*

Applying that same method of analysis, we held Louisville Metro's minimum wage ordinance to be in conflict with state law. In *Ky. Rest. Ass'n*, Louisville Metro had adopted an ordinance requiring a minimum wage higher than the statutory minimum of $7.25 an hour. 501 S.W.3d at 427. We held, "[t]he Ordinance at issue here requires businesses to pay workers a higher wage than the statutory minimum. KRS 337.275(1). In other words, what the statute makes legal, the Ordinance makes illegal and, thus, prohibits what the statute expressly permits." *Id.* at 428. Once again, LFUCG's logic would overturn this decision's rationale. Because Louisville Metro's ordinance required a higher minimum wage, complying with that ordinance would have ensured the Commonwealth's lower minimum wage was also complied with. That was not enough. Instead, because complying with the statute necessarily resulted in violating the ordinance, there was a conflict—"precisely the type of 'conflict' that is forbidden under Section 156b of our Constitution[.]" *Id.*

We can concede none of these cases are directly on point, and the dissent does point out means of distinguishing them. Truly though, we do not need to demonstrate which prior decisions are controlling or not to reach the correct conclusion in this case. We need only put SB 4 and the ordinance side by side and ask, "can the class of persons affected by these laws comply with

12

both simultaneously?" If not, there is a conflict. A person must not only be able to comply with the ordinance without violating the statute but must also be able to comply with the statute without violating the ordinance. Our jurisprudence teaches that conflict is a two-way street. Simply because the General Assembly erects guardrails around a certain issue does not mean a local government may not erect further guardrails; but the local government cannot close the street entirely. Applying this test, SB 4 controls and the ordinance is void.

Next, to its proposition that the General Assembly should be presumed to have been aware of Louisville/Jefferson County Metro Government's similar no-knock ordinance, passed before SB 4, we can only say that is a misuse of a canon of statutory interpretation. There are many general expressions of the rule that the General Assembly is presumed to be aware of previous laws when enacting a statute, but it specifically means "the General Assembly is aware of the constitution, previously enacted statutes and the common law." *Lewis v. Jackson Energy Co-op. Corp.*, 189 S.W.3d 87, 93 (Ky. 2005). It also applies to published judicial decisions of an appellate court construing a statute. *Normandy Farm, LLC v. Kenneth McPeek Racing Stables, Inc.*, 701 S.W.3d 129, 142 n. 11 (Ky. 2024). As a canon of statutory interpretation, it is only applicable when there is an ambiguity in the statute or an apparent conflict with another statute. *Brewer v. Commonwealth*, 922 S.W.2d 380, 381 (Ky. 1996) (quoting *Reynolds Metal Co. v. Glass,* 195 S.W.2d 280, 283 (Ky. 1946)). When two statutes seemingly or do conflict, the rule's salutary purpose is to

13

give effect to both if possible because both statutes are of equal authority. *Mitchell v. Univ. of Kentucky*, 366 S.W.3d 895, 900 (Ky. 2012). When a statute and ordinance conflict, however, the impetus for harmonization does not exist. "As is the osprey to the fish, who takes it by sovereignty of nature[,]" Shakespeare, *Coriolanus*, Act. IV, Sc. 7, so do statutes *always* prevail over a conflicting ordinance because "the sovereignty of the state still rules supreme." *Ky. Rest. Ass'n*, 501 S.W.3d at 428.

LFUCG tries to avoid this conclusion by arguing SB 4 is directory towards judges of the Commonwealth whilst the ordinance is directory towards members of the LPD. That is not true. SB 4 imposes a clear and convincing evidentiary standard, and it is for the warrant-issuing judge to determine whether that standard has been met. KRS 455.180(1)(a). But SB 4 also directs the actions of law enforcement officers. It is they who must get the approval of their superior officer before approaching the judge. *Id.* at (2). It is they who must consult with the Commonwealth's Attorney or County Attorney. *Id.* at (3). It is they who must execute no-knock warrants between 6 a.m. and 10 p.m. absent clear and convincing evidence of exigent circumstances. *Id.* at (5). And, we may add, it is they who must, through the warrant affidavit, demonstrate to the warrant-issuing judge the existence of clear and convincing evidence under the statute. RCr[6] 13.10(1). SB 4's creation of a criminal law proscribing law enforcement officers from perjuring themselves in a no-knock warrant affidavit

---

[6] Kentucky Rules of Criminal Procedure.

14

and making such perjury a Class D felony is irrefutable proof that SB 4 is as much directed towards law enforcement officers as it is to judges. KRS 523.020(1)(c).[7]

Finally, apropos of the judiciary's role in issuing no-knock warrants, we conclude the ordinance is an indirect infringement upon the judiciary's jurisdiction. Though not specifically argued at the trial court or briefed by the parties, the issue came up during oral argument; therefore, it is appropriate to comment upon it briefly. *Priestly v. Priestly*, 949 S.W.2d 594, 596 (Ky. 1997). We, as head of the judicial branch of the Commonwealth, are keen on separation of powers; particularly where the constitution has created hedges around certain individual rights and bestowed upon us a peculiar authority to maintain them. LFUCG's counsel conceded at oral argument that LFUCG has no authority to limit or infringe upon the judiciary's jurisdiction. *See generally McElroy v. Taylor*, 977 S.W.2d 929, 931 (Ky. 1998) ("The legislature . . . determines the jurisdiction of the district court."); *Jefferson Cnty. Bd. of Educ. v. Edwards*, 434 S.W.3d 472, 476 (Ky. 2014) ("The legislature has the authority to limit the circuit court's subject matter jurisdiction[.]"). "In the issuance of search warrants, courts have constitutionally mandated jurisdiction before prosecution commences." *Commonwealth v. Terrell*, 464 S.W.3d 495, 501 n. 18 (Ky. 2015).

---

[7] Judges are also liable to sanctions under SB 4. "A judge shall carefully review any application for a warrant pursuant to KRS 455.180 as a neutral and detached magistrate. Failure to act as a neutral and detached magistrate may be referred to the Judicial Conduct Commission." KRS 455.190.

15

Since LFUCG may not directly infringe upon the judiciary's jurisdiction to issue warrants, it cannot achieve the same outcome indirectly. *Briscoe v. Bank of the Commonwealth of Kentucky*, 36 U.S. 257, 318 (1837); *Bailey v. State of Alabama*, 219 U.S. 219, 244 (1911); *National Rifle Ass'n of America v. Vullo*, 602 U.S. 175, 190 (2024). That is precisely what it does by forbidding LPD officers from seeking no-knock warrants in spite of SB 4's unambiguous authorization that law enforcement officers within the Commonwealth can seek no-knock warrants under certain circumstances, and thereby limiting the judges of Lexington-Fayette County from issuing no-knock warrants when those circumstances are met as authorized by SB 4.

### III.    Conclusion

The ordinance is null, void, and of no effect. Nothing has been shown to negate this one salient fact: LPD officers are directly prohibited, and the judges of Lexington-Fayette County are indirectly limited by the ordinance from doing what the judges and law enforcement officers in the rest of the Commonwealth are authorized to do per the statute. The ordinance prohibits what the statute allows, it makes illegal what the statute declares is legal, and therefore contravenes the public policy of the Commonwealth. The Court of Appeals is reversed. We affirm Fayette Circuit Court's dismissal of the case on the alternative grounds articulated above.

Lambert, C.J.; Bisig, Conley, Keller, Nickell, and Thompson, JJ., sitting. Lambert, C.J.; Nickell, and Thompson, JJ., concur. Keller, J., dissents by

16

separate opinion which Bisig, J., joins in part. Bisig, J., dissents by separate opinion. Goodwine, J., not sitting.

KELLER, J., DISSENTING: I respectfully dissent. The Majority holds that LFUCG's no-knock ordinance (hereinafter, "Ordinance") is preempted by the provisions of SB 4. In reaching this conclusion, the Majority endorses an overly simplistic interpretation of preemption wherein state legislation operates as a ceiling rather than a floor, thereby effectively stripping local governments across the Commonwealth of their constitutionally vested authority.

Because I believe that the Ordinance is not preempted by SB 4, I would reach the merits of this dispute, and hold that LFUCG's passage of the Ordinance constituted a decision relating to "wages, hours, [or] other conditions of employment" pursuant to KRS 67A.6902(1). However, because the Ordinance not only imposes a new restriction on LPD officers, but in doing so also effectuates a policy related to public welfare, I would remand to the trial court for further factfinding and implementation of a balancing inquiry which weighs the interests of both LFUCG and the FOP. Furthermore, I would hold that LFUCG violated the CBAs when it declined to participate in the CBAs' outlined Grievance Procedure.

**A. The Ordinance is Not Preempted by State Law.**

As with any other municipality, LFUCG is a creature of statute and "possesses such powers, and such only, as the state, either expressly or by necessary implication, confers upon it, subject to addition or diminution at its supreme discretion." *Walker v. City of Richmond,* 189 S.W. 1122, 1124 (Ky.

17

1916). KRS 82.082 and KRS Chapter 83 vest local governments with broad authority through what is known as the "Home Rule." *Ky. Rest. Ass'n v. Louisville/Jefferson Cnty. Metro Gov't,* 501 S.W.3d 425, 427 (Ky. 2016). To that end, the General Assembly has broadly delegated to cities all power necessary to effectively pursue a public purpose within their boundaries, provided that the public purpose in question is not in conflict with a statute or constitutional provision. KRS 82.082(1); *see also* KY. CONST. § 156B.

Where a municipal ordinance conflicts with a constitutional provision or statute, the ordinance "is preempt[ed]," *Lexington Fayette Cnty. Food & Beverage Ass'n v. Lexington–Fayette Urb. Cnty. Gov't,* 131 S.W.3d 745, 750 (Ky. 2004). In other words, the municipality is "without authority" to enact that ordinance, and the ordinance must be struck down as "invalid[]." *Ky. Licensed Beverage Ass'n v. Louisville–Jefferson Cnty. Metro Gov't,* 127 S.W.3d 647, 649 (Ky. 2004). "The true test of the concurrent authority of the state and local government to regulate a particular area is the absence of conflict." *Lexington Fayette Cnty. Food & Beverage Ass'n,* 131 S.W.3d at 750. A municipal ordinance is "in conflict with a statute if it is expressly prohibited by a statute or there is a comprehensive scheme of legislation on the same general subject embodied in the Kentucky Revised Statutes." KRS 82.082(2).

An express conflict does not arise merely because local legislation prohibits conduct not explicitly forbidden by state law. *Louisville & Nashville R.R. Co. v. City of Covington,* 488 S.W.2d 329, 330–31 (Ky. 1972). Furthermore, "[t]he mere fact that the State has made certain regulations does not prohibit

18

local government from establishing additional requirements as long as there is no conflict between them." *Commonwealth v. Do, Inc.*, 674 S.W.2d 519, 522 (Ky. 1984). For a conflict to arise, the state legislation must contain "an affirmative expression of the legislature that no . . . limits may be placed" on the conduct. *Louisville & Nashville R.R. Co.*, 488 S.W.2d at 330–31. In other words, "[a]n ordinance . . . cannot forbid what a statute *expressly* permits." *Ky. Rest. Ass'n*, 501 S.W.3d at 428 (emphasis added).

The Ordinance at issue here bans the use of no-knock warrants by Lexington law enforcement officers and requires officers to knock and announce themselves before entering a premises to execute a warrant. The FOP argues that this Ordinance is preempted by KRS 455.180, *et seq.* KRS 455.180, entitled "Arrest or search warrant authorizing entry without notice; requirements for issuance," provides that "[n]o arrest warrant or search warrant shall be issued authorizing entry without notice unless . . ." The statute then proceeds to list several parameters within which the issuance of a no-knock warrant must occur. Furthermore, in KRS 455.200, entitled "Requirements for execution of warrant authorizing entry without notice," the General Assembly lists the specific requirements that must be met prior to execution of a no-knock warrant.

Statutes and ordinances are to be read "as a whole and in context with other parts of the law." *Lewis v. Jackson Energy Co-Op. Corp.*, 189 S.W.3d 87, 92 (Ky. 2005). The words used in a statute are to be given their customary meaning, and the statute is to be given effect as written if it is both

19

unambiguous and plain. *Lynch v. Commonwealth,* 902 S.W.2d 813, 814 (Ky. 1995).

Importantly, the language of the statute establishing the parameters and requirements for execution of a no-knock warrant does not expressly permit conduct which the Ordinance renders illegal. Instead, the statutes set forth the circumstances in which a no-knock warrant may be issued and executed. This is explicitly evidenced in the titles of KRS 455.180 and 455.200. Had the General Assembly intended to explicitly compel the issuance and execution of no-knock warrants by municipalities, it would have enacted a statute precisely denoting such an "affirmative expression." *Louisville & Nashville R.R. Co.,* 488 S.W.2d at 330. Instead, the statutes are restrictive only. While these statutes provide guidance for localities should they decide to employ no-knock warrants, none "explicitly direct[]" that localities actually issue and execute such warrants. *Dannheiser v. City of Henderson,* 4 S.W.3d 542, 548 (Ky. 1999).

In *Kentucky Restaurant Association v. Louisville/Jefferson County Metro Government,* the Louisville/Jefferson County Metro Government enacted its own minimum wage ordinance for all employers within its boundary. 501 S.W.3d at 427. The minimum wage set by the ordinance was higher than the $7.25 minimum wage presented in KRS 337.275(1), which provides that "every employer *shall* pay to each of his employees wages at a rate of . . . not less than seven dollars and twenty-five cents ($7.25) an hour." *Id.* (emphasis added). This Court held that the ordinance conflicted with KRS 337.275 because "what the statute makes legal, the Ordinance makes illegal, and, thus,

20

prohibits what the statute expressly permits." *Id.* at 428. We explained that the Kentucky statutory authority expressly permitted employers to pay wages "not less than seven dollars and twenty-five cents ($7.25) an hour" and the ordinance passed by Louisville Metro Government conflicted directly with the statute by raising that baseline. *Id.* This is "precisely the type of 'conflict' that is forbidden," and as a result, we held the ordinance invalid. *Id.*

Here, the No-Knock Ordinance at issue does not impose further affirmative obligations on LPD officers, nor does it directly conflict with state legislation. In *Kentucky Restaurant Association*, the statutory language explicitly required employers to pay a specified wage not less than seven dollars and twenty-five cents. *Id.* There is no comparative directive found in KRS 455.180 *et seq.* expressly authorizing the issuance and execution of no-knock warrants. Instead, the statutes merely provide the requirements that must be satisfied should law enforcement agencies seek such a warrant. Thus, the Ordinance does not expressly conflict with state legislation.

The Majority simplifies this express preemption analysis. Indeed, despite its recognition that no scholastic reasoning is necessary to justify the alleged conflict between LFUCG's ordinance and SB 4, the Majority employs a roadway/street analogy. It concedes that yes, the simple fact that the General Assembly has erected guardrails around an issue does not mean that a local government may not erect further guardrails. However, "the local government cannot close the street entirely." This analogy, and its conflation of preemption jurisprudence to a two-way street, misconceives the inquiry at the heart of

21

express preemption analyses. The question is not, "Does compliance with SB 4 constitute a violation of the Ordinance?". Instead, it must be posed in the alternative, "Does compliance with the Ordinance constitute a violation of SB 4?". To hold otherwise constitutes an intrusion on the broad authority vested in local governments under the "Home Rule." The second inquiry may be clearly answered in the negative, thus, I hold that the Ordinance is not preempted by SB 4.

The FOP alternatively suggests that LFUCG exceeded the bounds of its "home rule" power when it enacted the Ordinance, arguing that the Ordinance disturbed "a comprehensive scheme of legislation" on the subject of no-knock warrants. KRS 82.082(2). I disagree.

The mere presence of the state in a particular area of the law or regulation will not automatically eliminate local authority to enact appropriate regulations. *Lexington Fayette Cnty. Food & Beverage Ass'n,* 131 S.W.3d at 750. Instead, "[i]n order to rise to the level of a comprehensive system or scheme, the General Assembly must establish a definite system that explicitly directs the actions of a city." *Dannheiser,* 4 S.W.3d at 548. In turn, preemption by a "comprehensive scheme" will be found only when state legislation "so thoroughly occupies the legislative field that it may be reasonably inferred that [the General Assembly] left no room for [local government] to supplement it." *Lexington Fayette Cnty. Food & Beverage Ass'n,* 131 S.W.3d at 751 (quoting *Niehoff v. Surgidev Corp.,* 950 S.W.2d 816, 820 (Ky. 1997)). The fundamental question is whether "the General Assembly . . . intend[ed] to exclusively occupy

22

th[e] area of regulations." *Do, Inc.*, 674 S.W.2d at 521; *see also Wright v. Gen. Elec. Co.*, 242 S.W.3d 674, 678 (Ky. App. 2007) ("[Legislative] intent is the touchstone of all preemption analysis.") (quoting *Keck v. Commonwealth ex rel. Golden*, 998 S.W.2d 13, 15 n.4 (Ky. App. 1999)).

In *Lexington Fayette Cnty. Food & Beverage Ass'n*, we addressed whether the authority of local government to regulate smoking in business places of public accommodation was preempted by state law. 131 S.W.3d at 748. There, LFUCG passed an ordinance prohibiting smoking in public buildings. *Id.* The Lexington Food and Beverage Association argued that the following five statutes constituted a "comprehensive system of legislation" on smoking such that the ordinance was preempted:

> (1) KRS 217.005 to 217.215, called the "Kentucky Food, Drug and Cosmetic Act" and 902 KAR 45:005, called the "Retail Food Code"; (2) KRS 61.165, which governs smoking policy for all state and local government offices; (3) KRS 56.463, which authorizes the Finance and Administration Cabinet to adopt administrative regulations controlling state-owned and leased buildings and 200 KAR 6:045, which permits the designation of smoking and nonsmoking areas in public facilities; (4) KRS 438.050, which provides for fines for anyone smoking on school premises except in designated smoking areas; and (5) KRS 196.245, which authorizes the Commissioner of the Department of Corrections to prohibit or permit smoking by inmates.

*Id.* at 751. We observed that the statutes "are not a comprehensive system of legislation on smoking but are a collection of various statutes that mention smoking in a specific context." *Id.* Such a collection of statutes, absent "clear and unmistakable language," did not constitute an implied expression of

23

preemption by the General Assembly such that the ordinance conflicted with state law. *Id.* at 752.

By contrast, this Court has only invalidated local ordinances as being preempted by a "comprehensive scheme of legislation" where the state's presence involved either the enactment of legislation spanning multiple chapters or the enactment of extensive provisions within a single chapter. For example, in *Kentucky Licensed Beverage Association v. Louisville-Jefferson County Metro Government,* we held that, "[t]his Court has previously found that the General Assembly has provided a comprehensive scheme of legislation regulating the manufacturing, sale, and distribution of alcoholic beverages through its enactment of KRS Chapters 241 through 244." 127 S.W.3d at 649 (citing *Whitehead v. Est. of Bravard,* 719 S.W.2d 720, 722–23 (Ky. 1986)). There, the state's legislation, spanning three separate chapters of the Kentucky Revised Statutes, was sufficiently extensive. Furthermore, in *Kentucky Restaurant Association v. Louisville/Jefferson County Metro Government,* we held that the state's presence in the fields governed by Chapter 337 (Wages and Hour) constituted a "comprehensive scheme of legislation" because:

> [T]here are over 25 sections in this chapter, including penalty provisions. Some of the sections are quite lengthy. The chapter comprises over 50 pages in Michie's Kentucky Revised Statutes. The entire volume deals with employment related statutes, including, Child Labor, Unemployment Compensation, Occupational Safety and Health of Employees, and Workmen's Compensation.

501 S.W.3d 425, 428 (Ky. 2016).

Here, when the General Assembly passed SB 4, it enacted three separate statutes related to the (i) issuance of a no-knock warrant (KRS 455.180), (ii) judicial review of no-knock warrants (KRS 455.190), and (iii) execution of no-knock warrants (KRS 455.200). Further, SB 4 also amended KRS 523.020 (relating to perjury in procuring a warrant not requiring notice) and created a new rule of evidence, KRE 410A, making inadmissible the fruits of a search under a warrant that does not comply with KRS 455.180.

I begin by noting that the state's legislation on no-knock warrants, therefore, involves a mere five statutory sections. Of these five sections, three are included in Chapter 455, entitled "Miscellaneous Criminal Practice Provisions," and are located among nine other sections not at all related to no-knock warrants. The General Assembly's enactment of five statutory sections varies greatly from the enactment of three extensive chapters of legislation (*Kentucky Licensed Beverage Association v. Louisville-Jefferson County Metro Government*) or from the enactment of over twenty-five sections spanning over fifty pages (*Kentucky Restaurant Association v. Louisville/Jefferson County Metro Government*). Where there is simply "a collection of various statutes that mention [no-knock warrants] in a specific context," and the General Assembly omits a "clear and unmistakable" mandate directing localities to employ no-knock warrants, I simply cannot say that state legislation "so thoroughly occupies the legislative field that it may be reasonably inferred that [the General Assembly] left no room for [LFUCG] to supplement it." *Lexington Fayette Cnty. Food & Beverage Ass'n*, 131 S.W.3d at 751 (internal citations

25

omitted). These five statutory sections, while very important, do not constitute a "comprehensive scheme of legislation."

Furthermore, given the historical background against which KRS 455.180, *et seq.*, was enacted, I cannot conclude that the General Assembly intended to preclude municipalities from imposing more restrictive regulations on the issuance and execution of no-knock warrants. *See Do,* 674 S.W.2d at 521 (observing that preemption turns on "the General Assembly['s] inten[t]"). The General Assembly enacted the state legislation at issue nine months after Louisville Metro had already passed its own ordinance banning no-knock warrants. Despite its awareness of Louisville Metro's ban, the General Assembly nevertheless deliberately omitted any specific language invalidating the Louisville Metro ban on no-knock warrants. *See Osborne v. Commonwealth,* 185 S.W.3d 645, 649 (Ky. 2006) (General Assembly is presumed to be aware of existing laws when enacting new statutes on the same subject matter). The General Assembly's silence on this matter evinces a clear intention to permit further regulation by municipalities, and I would therefore hold that the Ordinance is not preempted by state legislation.

Finally, I address the Court of Appeals' conclusion that the Ordinance conflicts with KRS 95.019(1). KRS 95.019(1) states that "all members of the police force in urban-county governments . . . shall possess all of the common law and statutory powers of constables and sheriffs." The Court of Appeals suggested that the Ordinance conflicted with KRS 95.019 because "[t]he General Assembly did not abolish the power of all Kentucky sheriffs to utilize

26

no-knock warrants, and LFUCG lacks the authority to do so." This conclusion, however, is directly at odds with our decision in *Commonwealth v. Bishop*, 245 S.W.3d 733 (Ky. 2008).

In *Commonwealth v. Bishop*, we addressed whether a municipal order requiring that "[n]o city policeman or police car is to leave the Manchester City limits while on duty, unless an emergency arises," was preempted by KRS 95.019. 245 S.W.3d 733, 734 (Ky. 2008). In reviewing this inquiry, we noted that the purpose of KRS 95.019(1) is simply to affirm police officers' lawful "county-wide arrest powers," such that a suspect cannot challenge the legality of their arrest within a county, not to prevent localities from adopting "internal policies and procedures governing . . . city employees, including city police officers." *Id.* at 736. In turn, we held that municipal order did not conflict with KRS 95.019 because "[n]othing in KRS 95.019 expressly prohibits a city from creating an internal policy that requires its police officers to remain within the city limits," and state legislation did not reflect a "comprehensive scheme of legislation … regarding a fourth-class city's choice to limit the patrol area of its police officers." *Id.*

Accordingly, to the extent that a municipality engages in a valid exertion of its authority related to internal police practices, it is not preempted by KRS 95.019. *Id.* Here, the Ordinance's ban on no-knock warrants is an "internal polic[y] and procedure[] governing … city police officers" and does not conflict with LPD officer and sheriffs' lawful "county-wide arrest powers." *Id.* As a result, the Ordinance is not preempted by KRS 95.019.

27

## B. The No-Knock Ordinance Implicated "Other Conditions of Employment."

On appeal, LFUCG argues that its passage of the Ordinance was not a decision relating to "wages, hours, [or] other conditions of employment," KRS 67A.6902(1), and therefore is not subject to mandatory collective bargaining as a matter of law. Specifically, LFUCG alleges that (1) the Ordinance does not directly alter any term of LFUCG's employment relationship with LPD, and (2) even if the FOP could allege some direct effect on safety, the decision to adopt the Ordinance is predominantly a matter of public policy relating to public safety and public welfare, which precludes any obligation to bargain as a matter of law.

Pursuant to KRS 67A.6902-6903, LFUCG has the duty to bargain collectively with the FOP over issues related to "questions of wages, hours, and other conditions of employment." In enacting KRS Chapter 67A and deciding the mandatory subjects of collective bargaining, the General Assembly extracted the phrase "wages, hours, and other conditions of employment" from the National Labor Relations Act ("NLRA"). *See generally* National Labor Relations Act, § 8(a)(5)(d), *as amended* 29 U.S.C.A. § 158(a)(5)(d). Because what constitutes "other conditions of employment" is a matter of first impression for this Court, I look to guidance from our sister state courts and federal precedent on the matter. While not determinative nor binding, it is highly persuasive in appraising the propriety of including a particular subject within the scope of mandatory bargaining.

28

LFUCG argues that public policy and external precedent endorse a narrow interpretation of "other conditions of employment" wherein the duty to bargain would attach only to those decisions which directly impact LFUCG's employment relationship with LPD. I do not disagree; I posit, however, that the subject matter of the present dispute is well within the literal meaning of the phrase "other conditions of employment."

The NLRA does not immutably fix a list of issues subject to mandatory bargaining. *Allied Chem. & Alkali Workers of Am., Loc. Union No. 1 v. Pittsburgh Plate Glass Co., Chem. Div.*, 404 U.S. 157, 178 (1971). However, the phrase, "wages, hours, and other conditions of employment" does establish a limitation against which proposed bargaining topics must be measured. *Id.* At its most basic level, "the conditions of a person's employment are most obviously the various physical dimensions of his working environment. What one's hours are to be, what amount of work is expected during those hours, what periods of relief are available, what safety practices are observed, would all seem conditions of one's employment." *Fibreboard Paper Prods. Corp. v. Nat'l Lab. Rels. Bd.*, 379 U.S. 203, 220–21 (1964) (Stewart, J., concurring).

Some management decisions, such as choice of advertising and promotion, product type and design, and financing arrangements, have only an indirect and attenuated impact on the employment relationship. *See Fibreboard*, 379 U.S. at 223 (Stewart, J., concurring). Other management decisions, such as the order of succession of layoffs and recalls, production quotas, and work rules, are almost exclusively "an aspect of the relationship"

29

between employer and employee. *Allied Chem.*, 404 U.S. at 178. For those management decisions which focus primarily on a matter related to a third-party outside the employment relationship, but which inevitably have a direct impact on the employment relationship, bargaining is mandatory prior to that decision "only if the benefit, for labor-management relations and the collective-bargaining process, outweighs the burden placed on the conduct of the business." *First Nat. Maint. Corp. v. N.L.R.B.*, 452 U.S. 666, 679 (1981).

While it is true that the NLRA does not govern public sector employees, our own General Assembly nevertheless replicated the federal act when it drafted KRS Chapter 67A. In turn, I cannot dispute that the General Assembly found public sector and private sector employment relations sufficiently analogous so as to warrant similar bargaining provisions. Here, LFUCG's decision to pass and enact an ordinance prohibiting LPD officers from utilizing no-knock warrants is akin to a decision by a private business to impose a new rule upon its employees. *Allied Chem.*, 404 U.S. at 178. By enacting this Ordinance and imposing a new rule upon LPD officers, LFUCG engaged in a decision which had a clear impact on the "physical dimensions of [an officer's] working environment" and implicated "what safety practices are observed" by the LPD. *Fibreboard*, 379 U.S. at 220–21 (Stewart, J., concurring); *see also U.S. v. Ramirez*, 523 U.S. 65, 71 (1998) (acknowledging the safety implications of no-knock warrants and stating that, "[t]he police certainly had a 'reasonable suspicion' that knocking and announcing their presence might be dangerous to themselves or to others"). Such a decision clearly had a direct effect on the day-

30

to-day activities of LPD officers and "settle[d] an aspect of the relationship between the employer [LFUCG] and employees [the FOP]." *Allied Chem.,* 404 U.S. at 178 (citing *Local 24, Inter. Teamsters, etc., Union v. Oliver*, 358 U.S. 283 (1959)). In other disputes, this determination would satisfy my analysis and I would conclude that such a decision is undoubtedly subject to mandatory bargaining. However, the matter at hand is complicated by the fact that the Ordinance, whether intentionally or simply by its very nature, has dual aims. It not only imposes a new restriction upon LPD officers, but in doing so, also effectuates a policy related to public welfare.

In this respect, LFUCG contends that even if a decision does have a direct and significant impact on employment conditions, bargaining is not mandatory if the decision predominantly relates to the government employer's duty to enact policies for public welfare. While the General Assembly did not intend to limit the scope of mandatory bargaining simply because the parties are members of the public sector rather than the private sector, I recognize that KRS Chapter 67A necessarily presents certain tensions and difficulties in its application. In acknowledging the interests of the employees and the interests of the municipal employer as manager and political entity, such tensions arise when a proposed decision touches simultaneously upon wages, hours, and conditions of employment and upon public policy. To resolve these conflicts, our sister state courts have applied a balancing test. *See, e.g.*, *Nat'l Educ. Ass'n v. Bd. of Educ.*, 512 P.2d 426, 435 (Kan. 1973); *Sutherlin Educ. Ass'n v. Sutherlin School Dist. No. 130*, 548 P.2d 204, 205 (Or. 1976); *City of Beloit v.*

31

*Emp. Rels. Comm'n*, 242 N.W.2d 231, 236 (Wis. 1976). The fundamental inquiry of the balancing test asks, "whether the impact of the issue on the interest of the employe [sic] in wages, hours, and terms and conditions of employment outweighs its probable effect on the basic policy of the system as a whole." *Ass'n of Pa. State Coll. & Univ. Facs. v. Pa. Lab. Rels. Bd.*, 226 A.3d 1229, 1235 (Pa. 2020).

Here, we are faced with a situation in which the topic at issue both impacts the FOP's working conditions and implicates important policy considerations. Thus, I would weigh the impact of the Ordinance on the FOP's interest in its ability to implement a critical safety tool for protection of both law enforcement and the public against the Ordinance's impact on LFUCG's interest in protecting the public at large from unannounced entries. It is a difficult task to state whether one of these interests outweighs the other. On one hand, our society would not function if not for the brave individuals who risk their lives every day to uphold the law. On the other hand, we lend significant deference to those policies which seek to protect the rights and safety of the public at large. Viewed in this context, the policy considerations underlying the Ordinance are understandably of great importance, and I acknowledge that this inquiry is necessarily fact intensive. Though the Court of Appeals did not explicitly apply this balancing of interests, its holding on this issue necessarily contemplates the principle. The Court of Appeals held that the determination of LFUCG's statutory duty to bargain regarding the Ordinance required further discovery and judicial fact-finding as to whether the

32

Ordinance, in fact, improved or undermined officer safety, and whether it, in fact, would make the public more or less safe. I agree with the Court of Appeals that such findings are necessary to the completion of this inquiry. Because LFUCG has an explicit statutory duty "to negotiate in good faith with respect to . . . conditions of employment," the Ordinance at issue is a "condition[] of employment," and the Ordinance relates to LFUCG's duty to enact policies related to the public's welfare, it is necessary that the parties submit further proof as to how officer safety and public safety are impacted by the Ordinance. I would, therefore, remand for further fact finding and implementation of this balancing inquiry.

Finally, LFUCG argues that even if the decision to enact the Ordinance was subject to mandatory bargaining under KRS 67A, bargaining was still not required in the present case because the CBAs contain a management rights clause in Article 3. Article 3, Section 1, provides that:

> The parties agree that all rights or authority not expressly limited, abridged, delegated or modified by clear provisions of this Agreement are retained by [LFUCG]. Rights and authority retained by [LFUCG] shall include, but shall not be limited to, the following . . . The right to promulgate, at its discretion, policies, rules, regulations, and Orders which are not inconsistent with this Agreement.

Because the subject of no-knock warrants is not addressed in the CBAs, LFUCG contends that Article 3 reserves its right to enact the Ordinance unilaterally. This argument lacks merit in light of our above holding. Article 3 reserves the right of LFUCG to promulgate polices which "are not inconsistent with this Agreement." Here, at the very least, LFUCG's decision to enact the Ordinance implicated a "condition of employment" which it was presumably

33

required to bargain pursuant to Article 1. LFUCG's unilateral action in this instance was therefore "inconsistent with this Agreement" and in turn not subject to Article 3.

My conclusion that the Ordinance at issue here implicated a "condition of employment" and may be subject to mandatory collective bargaining is further reinforced by the very foundation of collective bargaining statutes. One of the primary purposes behind the NLRA is "to promote the peaceful settlement of industrial disputes by subjecting labor-management controversies to the mediatory influence of negotiation." *Fibreboard*, 379 U.S. at 211. The NLRA was "framed with an awareness that refusals to confer and negotiate had been one of the most prolific causes of industrial strife." *Id.* Modeled off the NLRA, our own parallel KRS Chapter 67A was necessarily formulated with similar considerations in mind. The idea that the enactment of an ordinance which regulates the conduct of LPD officers on a daily basis implicates a "condition of employment" and thus may be a mandatory subject of collective bargaining promotes the fundamental purpose of KRS Chapter 67A, as it brings a concern of vital importance to labor unions within the framework established by the General Assembly as most conducive to industrial peace.

Although it is not possible for me to say whether a satisfactory solution could have been reached between the parties, our state's labor policy is founded upon the General Assembly's determination that the mere possibility of agreement is meritorious enough to warrant subjecting such issues to the

process of collective negotiation. It is not for myself, or this Court, to question such foundational ideals, and I would thereby be inclined to uphold LFUCG's statutory duty to collectively bargain in this case, subject, of course, to the trial court's further factual findings regarding the balancing inquiry outlined above.

## C. LFUCG Violated the CBAs When it Declined to Participate in the Grievance Procedure.

Following the enactment of the Ordinance, the FOP, in line with the Grievance Procedure set forth in Article 11 of the CBAs, requested an arbitration panel from the Federal Mediation and Conciliation Service. After LFUCG declined to participate in the Grievance Procedure, the FOP amended its complaint to add a breach of contract claim for LFUCG's alleged violation of Article 11. On appeal, LFUCG now argues that: (1) the FOP waived any right to compel grievance arbitration when it affirmatively sought judicial relief in the circuit court, and (2) the Grievance Procedures of the CBAs do not apply to this dispute.

### a. The FOP did not waive its right to compel grievance arbitration.

Under Kentucky law, waiver has been generally defined as "a voluntary and intentional surrender . . . of a known right." *Am. Gen. Home Equity, Inc. v. Kestel*, 253 S.W.3d 543, 550 (Ky. 2008) (quoting *Conseco Fin. Servicing Corp. v. Wilder*, 47 S.W.3d 335, 344–45 (Ky. App. 2001)). "A waiver may be express or implied, although waiver [of arbitration rights] will not be inferred lightly." *Id.* Because the FOP did not expressly waive its right to arbitrate, the issue we are faced with here is whether the trial court could have inferred waiver from the

FOP's conduct. A party may waive its contractual right to arbitrate if it initiates or participates in a judicial proceeding without requesting arbitration. *See Jackson v. Mackin*, 277 S.W.3d 626, 629–30 (Ky. App. 2009) (citing *Valley Constr. Co., Inc. v. Perry Host Mgmt. Co., Inc.*, 796 S.W.2d 365 (Ky. App. 1990)). Where a party has engaged in litigation, we have explained that:

> [A] court's task is to determine, given all the facts and circumstances of the litigation conduct that has occurred before it, whether the party seeking arbitration has acted in a manner inconsistent with the intent to exercise arbitration rights such that one could reasonably infer that the party has voluntarily relinquished their arbitration rights.

*Kestel*, 253 S.W.3d at 556. Whether a party waived a contractual right to arbitrate is a question for the Court. *Id.* at 543.

Here, LFUCG argues that the FOP waived its right to compel grievance arbitration when it affirmatively filed its lawsuit in circuit court seeking judicial relief before LFUCG had even responded to the FOP's grievance demand. However, this argument misinterprets when a litigation conduct-based waiver may occur. On June 30, 2021, the FOP filed suit in circuit court seeking declaratory judgments that: (1) LFUCG had a duty under KRS 67A.6902 to bargain with the FOP prior to enacting the Ordinance, and (2) that the Ordinance was preempted by state legislation. This initial suit related to LFUCG's *statutory* duty to collectively bargain. The FOP invoked the Grievance Procedure and sought arbitration that same day on the issue of whether LFUCG had breached various provisions of the CBAs in enacting the Ordinance. This grievance related to LFUCG's *contractual* duty under the CBAs

36

to collectively bargain. The FOP did not amend its original complaint to add the breach of contract claim contained in the grievance until August 31, 2021, *after* LFUCG declined to participate in the grievance arbitration.

The FOP filed its grievance related to LFUCG's contractual obligations under the CBAs on the same day that it had filed its action in circuit court regarding LFUCG's statutory obligations, and it did not seek judicial relief on the contractual claim until after LFUCG declined to participate in arbitration. This is not the conduct of a party whose actions were "clearly inconsistent with an intent to seek arbitration." *Kestel*, 253 S.W.3d at 554. Indeed, it is quite the opposite. The FOP clearly sought arbitration on its breach of contract claim, and it did not amend its complaint in circuit court until after LFUCG declined to participate in the grievance arbitration process. *See Jackson*, 277 S.W.3d at 629–30. Accordingly, I would hold that the FOP did not waive its right to compel grievance arbitration.

### b. The FOP presented a grievable controversy related to the "meaning and application" of the CBAs.

Federal labor law provides the appropriate framework for addressing "the interpretation of the provisions of collective bargaining agreements which provide for arbitration." *United Brick and Clay Workers of Am., Local No. 486 v. Lee Clay Prods. Co., Inc.*, 488 S.W.2d 331, 334 (Ky. 1972). When a collective bargaining agreement contains an arbitration clause, there is a presumption that all disputes should be submitted to arbitration. *AT&T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 650 (1986). This presumption may be

overcome only if "'it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.'" *Id.* (quoting *United Steelworkers v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 583 (1960)). This presumption of arbitrability for labor disputes recognizes the greater institutional competence of arbitrators in interpreting collective-bargaining agreements, "furthers the national labor policy of peaceful resolution of labor disputes and thus best accords with the parties' presumed objectives in pursuing collective bargaining." *Schneider Moving & Storage Co. v. Robbins,* 466 U.S. 364, 371–72 (1984) (citations omitted).

The FOP's grievance alleged that when LFUCG enacted the Ordinance, it violated its contractual duties under Article 1 ("bargain promptly upon request by [the FOP] and continue for a reasonable period of time in order to… reach agreement on matters within the scope of representation"), Article 2 ("subject and subordinate to all applicable statutes"), and Article 14 ("take precautions to safeguard the health and safety of Members"). Pursuant to Article 11 of the CBAs between LFUCG and the FOP, the Grievance Procedure governs "***[a]ny controversy*** between LFUCG and the [FOP] concerning the ***meaning and application*** of ***any provisions*** of [the CBAs]." (emphasis added). Considering the broad language utilized by the parties in the Grievance Procedure, the presumption favoring arbitration prevails unless there is an "express exclusion or other forceful evidence" that the parties did not intend for the arbitration clause to apply to the subject matter of the dispute. *AT&T,* 475 U.S. at 652.

In determining arbitrability, "[i]t is the court's duty to interpret the agreement and to determine whether the parties intended to arbitrate" the issues raised by the grievances. *AT&T*, 475 U.S. at 651. If the issues are arbitrable, the court must defer to the arbitrator for a determination of the merits of the parties' conflicting interpretations of the agreement. *Id.*

LFUCG cites *City of Covington v. Covington Lodge No. 1, Fraternal Ord. of Police*, 622 S.W.2d 221 (Ky. 1981) for the proposition that a city cannot be compelled to submit to the authority of a labor arbitrator to decide matters pertaining to "the city's legislative control over the police department." LFUCG's argument is misplaced. *City of Covington* involved a collective bargaining agreement between the city and a police union wherein the parties had to submit to *binding* arbitration if the parties could not agree as to any or all terms of a new contract. 622 S.W.2d at 221. We held this arbitration clause to be an illegal delegation of legislative powers, as Kentucky statutory law dictates that control of the police department is vested in the legislative body of cities. *Id.* at 223.

Here, pursuant to Article 11, the decision of the arbitrator is advisory. Furthermore, *City of Covington* specifically involved an arbitration clause concerning the ability of the city to enter into future collective bargaining agreements. We specifically noted that our concern in that case was that "the binding arbitration clause may well have the effect of requiring future legislative bodies of the City of Covington to enter into collective bargaining agreements. Such a decision is clearly a legislative one, and as such, is clearly

39

invalid." *Id.* Nothing in our decision rendered a grievance procedure concerning the "meaning and application" of other provisions of the CBAs illegal or contrary to public policy. In turn, *City of Covington* is clearly distinguishable from the present dispute and inapplicable.

Finally, LFUCG argues that the Grievance Procedure would not apply here because there is no provision of the CBAs which addresses the execution of warrants. This argument lacks merit. Here, the FOP's grievance properly alleged a "controversy . . . concerning the meaning and application" of Articles 1, 2, and 14. It was not necessary that there need be a specific provision concerning the execution of warrants, as the controversy alleged by the FOP related to the enactment of the Ordinance and how it fell within the scope of the Articles. Each party has interpreted those Articles differently, with LFUCG and the FOP on opposite sides regarding whether the Ordinance is preempted by state law such that it violates Article 2 and whether it implicates officers' "health and safety" under Article 14 such that LFUCG was required to bargain pursuant to Article 1. The FOP's interpretation of these Articles is no more or less plausible than LFUCG's interpretation. Thus, it cannot be said "with positive assurance" that the Articles are not susceptible to the FOP's interpretation. *AT&T*, 475 U.S. at 650. As a result, I would hold that the present dispute is subject to the Grievance Procedure set forth in Article 11 of the CBAs, and LFUCG therefore violated the CBAs when it refused to participate.

**D. Conclusion.**

Because the Majority opinion incorrectly finds a conflict where there is none, and in turn fails to reach the merits of this appeal, I must dissent. I would affirm in part, reverse in part, and remand this case to the trial court for further proceedings consistent with this opinion.

Bisig, J., joins in part.

BISIG, J., DISSENTING: I respectfully dissent from the Majority Opinion and would affirm the trial court in full. Further, while I fully agree and join Justice Keller's dissent to the extent it concludes the Ordinance at issue was not preempted, I separately also conclude that LFUCG was not required to arbitrate regarding its passage of the Ordinance.

While the sacred right of workers to collectively bargain regarding their wages, rights and employment conditions is of the highest order, as other jurisdictions have recognized, the core public policy and managerial decisions of a governmental body should not be subject to collective bargaining. This is for the obvious reason that it removes such decisions from the democratic process and infringes on the government's managerial responsibilities:

> Matters of public policy are properly decided, not by negotiation and arbitration, but by the political process. This involves the panoply of democratic institutions and practices, including public debate, lobbying, voting, legislation and administration. . . . **"[T]he very foundation of representative democracy would be endangered if decisions on significant matters of governmental policy were left to the process of collective negotiations . . . Our democratic system demands that governmental bodies retain their accountability to the citizenry."**

41

*Local 195, IFPTE, AFL-CIO v. New Jersey*, 443 A.2d 187, 191 (N.J. 1982)

(quoting *Ridgefield Park Ed. Ass'n v. Ridgefield Park Bd. of Ed.*, 393 A.2d 278

(N.J. 1978)) (emphasis added).

> [d]ecisions involving the betterment of police-community relations and the avoidance of unnecessary deadly force are of obvious importance, and directly affect the quality and nature of public services. The burden of requiring an employer to confer about such fundamental decisions clearly outweighs the benefits to employer-employee relations that bargaining would provide.

*Building Material & Constr. Teamsters' Union v. Farrell*, 715 P.2d 648, 655-56

(Cal. 1986). This is so even where the ordinance at issue impacts officer safety.

*See San Jose Peace Officer's Ass'n v. City of San Jose*, 78 Cal. App. 3d 935

(1978). As such, I would find that LFUCG's policy determination regarding the

appropriate balancing of community relations, public safety, and officer safety

as set forth in the Ordinance is a public policy decision which should be left

solely to the democratic process rather than to collective bargaining. I

therefore would affirm the trial court in full.

COUNSEL FOR APPELLANT:

Jason P. Renzelmann
Jennifer L. Bame
Alexander L. Ewing
Frost Brown Todd LLP

COUNSEL FOR APPELLEE:

Scott A. Crosbie
Nicholas A. Oleson
Mattmiller Crosbie, PLLC

COUNSEL FOR AMICUS CURIAE,
KENTUCKY LEAGUE OF CITIES:

Megan J. Griffith
Morgain M. Patterson

COUNSEL FOR AMICUS CURIAE,
LOUISVILLE/JEFFERSON METRO COUNTY GOVERNMENT:

Mike O'Connell
Kathryn Meador Goodwin
Jefferson County Attorney

COUNSEL FOR AMICUS CURIAE,
NATIONAL PUBLIC EMPLOYER LABOR RELATIONS ASSOCIATION:

David F. Broderick
Brandon T. Murley
Broderick & Davenport